Filed 2/18/22  P. v. Luna CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RAFAEL ANTONIO LUNA,<br><br>Defendant and Appellant. | F081618<br><br>(Super. Ct. No. 05CM9002-003)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Kings County.  Donna L. Tarter, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Hill, P. J., Poochigian, J. and Meehan, J.

## INTRODUCTION

In 2006, a jury convicted petitioner Rafael Antonio Luna of the first degree murder of Marcos V.[1] (Pen. Code,[2] § 187, subd. (a), count 1) with the special circumstance petitioner intentionally killed Marcos while an active participant in a criminal street gang (§ 190.2, subd. (a)(22)).[3] For this offense and the associated enhancements, the trial court sentenced petitioner to a term of life without the possibility of parole plus a term of 15 years to life. (*People v. Luna* (Mar. 16, 2007, F050272) [nonpub. opn.] (*Luna*).)

In 2019, petitioner filed a petition for resentencing pursuant to section 1170.95. The court summarily denied the petition on the ground petitioner aided and abetted in the murder with an intent to kill.

On appeal, petitioner contends the trial court improperly applied a substantial evidence test and engaged in improper factfinding to deny the petition. Petitioner further contends the error was not harmless because the record of conviction suggests he may have been found guilty of first degree murder and conspiracy to commit murder based on imputed malice and imputed premeditation, and the gang special circumstance may have been found true without a finding of an intent to kill. He therefore contends there is reasonable doubt as to whether he was convicted under a legally valid theory. Lastly, petitioner contends the trial court violated his procedural due process rights by denying his petition without issuing an order to show cause.

To the extent the trial court may have engaged in improper factfinding to deny the petition at the prima facie stage, we conclude the error was harmless because the record

---

[1] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended.

[2] Subsequent statutory references are to the Penal Code, unless otherwise indicated.

[3] Petitioner was convicted of additional offenses and enhancements, as described below.

establishes petitioner is ineligible for resentencing as a matter of law. We therefore conclude petitioner's remaining arguments are without merit. Accordingly, we affirm the trial court's order denying resentencing relief pursuant to section 1170.95.

## FACTUAL AND PROCEDURAL BACKGROUND

We include the statement of facts from our prior opinion in petitioner's direct appeal:[4]

"At 5:30 a.m. on August 28, 2004, Marcos . . . was fatally shot outside his apartment complex in Avenal while waiting for a ride to work. The Kings County Sheriff's Department immediately suspected that [Marcos], who was associated with Avenal's Norte[ñ]o gang, was shot as part of the on-going conflict with the local Sure[ñ]o gangs. After a lengthy investigation, [petitioner] and codefendants Victor Manuel Castaneda, Gonzalo Murguia, and Jose Naranjo, were charged with conspiracy and murder of [Marcos]. [Petitioner] was tried separately and convicted of first degree murder and conspiracy to commit murder.

"**The Rivalry**

"There are three gangs in Avenal which are connected to the Sure[ñ]os: the Tiny Loco Sure[ñ]os (TLS), the Varrio Plaza Wild (VPW), and the Barrios Plaza Wild (BPW). The three Sure[ñ]o gangs have a combined membership of 400 people, and claim the color blue and the number 13. There is one rival Norte[ñ]o gang in Avenal, the Avenal Varrio Lomas (AVL).

"Jose 'Little Man' Valladares (Valladares) was the leader of the Sure[ñ]os in Avenal. Valladares lived in a house on Laneva Street in Avenal. The Kings County Sheriff's Department was familiar with Valladares's house as a 'hub' of Sure[ñ]o gang activity and narcotics usage. The Sure[ñ]os called Valladares's house '33,' referring to nearby Highway 33. [Petitioner], Jose [J.], . . . Naranjo, . . . Castaneda, and [Jaime F.] were also associated with the Sure[ñ]o gangs in Avenal, and frequent visitors to Valladares's house.

---

[4] This court previously granted the People's request for judicial notice of this court's prior opinion and the record in petitioner's direct appeal. We provide these facts for background purposes because they were relied upon by the trial court. However, we do not rely on these facts in resolving the issues presented in this appeal. (See § 1170.95, subd. (d)(3).)

3.

"On the night of August 20, 2004, 14-year-old R.G. left a school dance and walked to his home on Laneva Street. R.G.'s uncle was Valladares, but R.G. was not a member of the Sure[ñ]os. There was a family gathering at the Laneva Street house that night. R.G. testified that as he walked through the alley behind his house, he saw someone watching him from behind a fence. A man stepped into the alley and confronted R.G. The man asked R.G. if he was a 'scrap,' referring to the Sure[ñ]os. R.G. said no but the man did not seem to believe him. R.G. testified the man was tall and dressed entirely in black, except for a red and black mask, and R.G. could not see the man's face. The man shot R.G. in the left arm and left side, and ran away.

"At trial, R.G. testified that he believed the gunman was a Norte[ñ]o who mistakenly thought he was a Sure[ñ]o. R.G. testified he did not discuss the shooting with his uncle, his uncle never discussed retaliation with him, and his uncle only asked if his arm hurt.

"**The Homicide**

"Marcos . . . and his girlfriend, Laura [R.], lived in [an apartment complex] on South 7th Street in Avenal. [Marcos], who was 23 years old, was affiliated with the Norte[ñ]o gang. At some point in August 2004, [Marcos] was in a fight with Lynol [C.] and two other men associated with the Sure[ñ]os. The fight started after [Marcos] exchanged looks with the other men.

"At 5:30 a.m. on August 28, 2004, [Marcos] followed his usual routine of getting up and going to work. He said goodbye to [Laura] and grabbed his lunch bag. He left their apartment and walked to the street to wait for his usual ride. Within five to 10 minutes, [Laura] heard [Marcos] yelling and banging at their apartment door. [Marcos] was standing at the doorway and holding his chest, and there was blood on his shirt. He was crying and in pain. [Marcos] repeatedly said, ' "[T]hey shot me," ' and ' "I'm going to die! I'm going to die! Somebody shot me!" ' [Laura] called 911. [Marcos] was lying on the ground, his face was turning color, and he had trouble breathing. [Laura] tried to apply pressure to the wound with a towel.

"[Laura] testified that she knew [Marcos] had been waiting for his ride, assumed a drive-by shooting had occurred, and asked [Marcos] who shot him and whether they were in a car. [Laura] testified [Marcos] moved his fingers in a walking motion, which she interpreted as meaning the shooter was walking. [Laura] thought the shooting was in retaliation against [Marcos] for his recent fight with [Lynol].

4.

"Skyler [S.] lived in the same apartment complex, and was awakened by two loud bangs, and screams of ' "I've been shot!" ' and ' "Help me, Laura, I'm dying!" ' [Skyler] went outside and found [Laura] trying to help [Marcos], who was moaning, groaning, and holding his left side. [Skyler] testified [Laura] kept asking [Marcos] who shot him. [Marcos] repeatedly said ' "those guys" ' shot him and he was ' "dying." '

> " 'Q. Okay. But he clearly said "those guys" and those, you understand, that is not singular, that means two?
>
> " 'A. Plural.
>
> " 'Q. Something in plural, more than one person, correct?
>
> " 'A. Yes.'

"[Skyler] asked [Marcos] who shot him, and [Marcos] replied, ' "those guys." ' [Marcos] also said ' "they drove up and shot me." ' [Skyler] further testified:

> " '. . . [W]hen [Laura] was asking him, you know, "who shot you? Who shot you?" He said "those guys" and then he said the word— you know, I'm pretty sure it was the word "little" but I'm not 100 percent sure.' "

"[Skyler] did not know what [Marcos] meant by the word ' "little." '

"[Marcos] was treated at the scene by emergency personnel and transported by ambulance to University Medical Center in Fresno. He slipped into a coma before he reached the hospital and died in the emergency room. He had been shot in the left upper arm and in the left chest. One bullet entered the left chest, passed through his vital organs, caused massive internal bleeding, and lodged just under his skin in the right lower chest. This bullet was removed from his body, and it was consistent with being fired from either a .38-caliber or nine-millimeter weapon.

"The investigators found [Marcos]'s lunch bag and blood on the South 5th Street side of the apartment complex, with a blood trail leading to [Laura]'s apartment. A nine-millimeter bullet was found about 50 feet from [Marcos]'s lunch bag. The bullet looked like it had been run over.

"**The Investigation**

"The investigators suspected the fatal shooting of [Marcos], a Norte[ñ]o, was gang-related and possibly performed by a Sure[ñ]o, in

5.

retaliation for the on-going rivalry between the Avenal gangs. It was also noted that [Marcos] was shot on the left side, just as R.G. had been shot on the left side.

"Sergeant [D.] Jones interviewed R.G. after [Marcos]'s death, based on the possibility that [Marcos] was shot in retaliation for the assault on R.G. R.G. said that on the night he was shot, Valladares (his uncle) instructed him to tell the police 'that it was a [S]ure[ñ]o gang member by the nickname of Stinky that had shot him.' R.G. told the police that ' "Stinky" ' was the only person ' "that goes around shooting people in the past." ' At trial, however, R.G. denied he made that statement, or that his uncle told him to name 'Stinky' as a suspect. R.G. said that even if he knew his uncle shot [Marcos], he would not tell the police.

"Detective [M.] Bevens interviewed [petitioner] on August 29, 2004, and asked if he knew anything about the homicide of [Marcos]. [Petitioner] was cooperative, said he was not involved in the shooting, and gave an alibi.

"As the investigation continued, Jaime . . . , who was associated with the Sure[ñ]os, cooperated with the deputies. [Jaime] said he was at Valladares's house after R.G. was shot, and heard a conversation that the Sure[ñ]os were going to retaliate against a Norte[ñ]o. [Jaime] offered to help in the retaliation. [Jaime] agreed to 'go out and shoot' . . . 'Stinky' Marin, a Norte[ñ]o. Valladares gave [Jaime] a .38-caliber revolver to accomplish the act. [Jaime] testified [petitioner] was not present during this conversation.

"[Jaime] testified he left Valladares's house with the gun, and understood that he was supposed to 'shoot [Stinky],' but testified that he never intended to shoot [Stinky]. Instead, he fired the gun into an open field behind his house. [Jaime] returned to Valladares's house, gave the gun back to Valladares, and falsely told Valladares and the other Sure[ñ]os that he shot at [Stinky], because he did not want to let them down. Jose [J.] left to find out what happened, and determined [Jaime] did not shoot [Stinky]. [Jaime] testified they made fun of him for being a chicken and not shooting at [Stinky], but did not exclude him from being at Valladares's house, and [Jaime] repeatedly returned there to purchase methamphetamine.

"[Jaime] testified he was at Valladares's house on another occasion, when . . . Naranjo and . . . [Murguia] told Valladares that [Marcos] left his home every morning around 5:30 a.m. [Jaime] testified that on another occasion, Naranjo and Murguia arrived at Valladares's house with a gun,

6.

Murguia told Valladares they went to [Marcos]'s apartment complex in the early morning hours, they waited for [Marcos] to catch his ride, but 'they couldn't do it, they didn't do it.' Valladares took the gun back from them. Murguia later told [Jaime] that he did not have the heart to shoot [Marcos], just like [Jaime] could not bring himself to shoot anybody.

"[Jaime] agreed to further cooperate with the investigation and talk to [petitioner] while wearing a 'body wire' transmitter, so the investigators could record and listen to his conversation with [petitioner]. [Petitioner] and [Jaime] were not in custody during this conversation, and they talked about the fatal shooting of [Marcos]. [Petitioner] told [Jaime] that he drove Valladares to the back gate of the . . . apartment complex, dropped him off, and Valladares 'went to handle his business.' [Petitioner] said he did not shoot [Marcos]. [Petitioner] said he heard two 'pow[s]' and the victim screamed 'like a hina,' meaning a bitch. [Petitioner] said he left the area after he heard the shots and screams. [Petitioner] said the screams bothered him and he had dreams about it. [Petitioner] said Valladares thought [petitioner] was going to do it, ' "but he was wrong. It was his business," ' and [petitioner] did not know anything about it. [Petitioner] complained that [Marcos] would have lived if he had been taken to the hospital by helicopter. [Petitioner] also told [Jaime] that he could not have been present at the homicide because he was with Jesus [E.] until 5:30 a.m.

"**[Petitioner]'s Statement**

"On June 7, 2005, Sergeant Jones and Detective Bevens conducted another interview with [petitioner]. [Petitioner] was in custody on an unrelated matter. At the beginning of the interview, [petitioner] denied any knowledge or involvement in the fatal shooting of [Marcos]. The officers then played the recording of [petitioner]'s conversation with [Jaime], and [petitioner] admitted his voice was on the recording. [Petitioner] did not give any explanation for why he said certain things to [Jaime], and admitted he was involved in the shooting of [Marcos]. [Petitioner] said he had been present at a discussion with a couple of other Sure[ñ]o gang members about selecting a target for retaliation. [Petitioner] said he had been driving around with Jose [J.], and they saw [Marcos] standing outside his apartment complex. They told Valladares about the sighting, and Valladares said that [Marcos] would be the target.

"[Petitioner] said that on August 28, 2004, he was supposed to meet Murguia, go to a particular location, and shoot [Marcos], but Murguia did not show up. [Petitioner] said Valladares had the gun they were supposed to use, a .38-caliber chrome firearm. When Murg[u]ia did not appear,

7.

Valladares told [petitioner] to drop him off instead. Sergeant Jones testified that [petitioner] explained the protocol of such an event:

> " '[Petitioner] actually described how this type of thing should take place as in he described how a hit or a murder with one of your friends should take place. And in that description, he said "you don't sit there and watch it" so that there is only—it's only between the murder and the victim. You stay close by so that when it's over, you could pick him up and then he went on to describe that that is how this happened. He dropped off . . . Valladares, waited down the street . . . , heard the shots, heard the scream after both shots and then picked up . . . Valladares.' "

"[Petitioner] knew that Valladares crept up on the victim in the dark, because there were no lights in the area, and he used a chrome .38–caliber handgun to shoot [Marcos] in the arm and side. [Petitioner] said he drove back to Valladares's house, about a mile away from the . . . apartments, and Valladares got rid of the evidence. [Petitioner] also said that 'Pepe' and . . . Castaneda may have taken care of getting rid of Valladares's clothes.

"Deputy [J.] McGill testified for the prosecution as a gang expert. He explained that if a rival gang attacks the family of another gang member, they must retaliate to avoid the appearance of weakness. McGill testified the primary activities of the Sure[ñ]os in Avenal were assaults with a deadly weapon, drive-by shootings, homicides, attempted homicides, and robberies. McGill testified to his opinion that if a Norte[ñ]o shot the family member of a Sure[ñ]o, and eight days later a Sure[ñ]o killed a person affiliated with the Norte[ñ]os, that crime was committed for the benefit of the Sure[ñ]os to create respect and fear.

"Deputy McGill testified [petitioner] was a member of the Sure[ñ]o gang based on several factors: [petitioner's] 1998 booking classification at the juvenile center, that he was a Sure[ñ]o; [petitioner]'s letter of April 2001, intercepted by authorities, in which he discussed his decision to join the Sure[ñ]os; a police report from December 2001 about [petitioner]'s vandalism of a Norte[ñ]o's car with Sure[ñ]o gang writing; [petitioner]'s presence with Ja[im]e . . . during a traffic stop on August 29, 2004; and [petitioner]'s presence in a vehicle involved in a drive-by shooting on June 6, 2005, when the vehicle contained gang photographs, a blue jersey, and a blue bandana. [Petitioner] also told an officer that he had joined the Tiny Loco Sure[ñ]os, and explained his various gang tattoos. On June 15, 2005, [petitioner] was in custody in jail when officers discovered gang graffiti on his jail clothing, bedding, and within his cell, consistent with Sure[ñ]o gang signs." (*Luna*, *supra*, F050272, fn. omitted.)

On January 20, 2006, the Kings County District Attorney filed an information charging petitioner with first degree murder (§ 187, subd. (a), count 1) and conspiracy to commit murder (§§ 182, subd. (a)(1), 187, subd. (a), count 2). On March 29, 2006, a jury convicted petitioner of first degree murder and conspiracy to commit murder. As to both counts, the jury found true a special circumstance that petitioner intentionally committed the murder while an active participant in a criminal street gang and the murder was carried out to further the activities of the gang (§ 190.2, subd. (a)(22)). Moreover, as to both counts, the jury found true gang (§ 186.22, subd. (b)(4), (5)), firearm (§ 12022.53, subds. (d), (e)(1)), and great bodily injury (§ 12022.7, subd. (a)) enhancements. (*Luna*, *supra*, F050272.)

On April 21, 2006, the trial court sentenced petitioner on count 1 to a term of life without the possibility of parole. Sentence on the gang, firearm, and great bodily injury enhancements was stayed pursuant to section 654. As to count 2, the trial court imposed another term of life without the possibility of parole. However, sentence on count 2 and the associated enhancements were stayed pursuant to section 654.[5]

On March 11, 2019, petitioner, in propria persona, filed a petition for resentencing pursuant to section 1170.95. In the form petition, petitioner stated a complaint, information, or indictment was filed against him that allowed him to be prosecuted under a theory of felony murder or murder under the natural and probable consequences doctrine; he was convicted of first or second degree murder at trial; and he could not now be convicted of first or second degree murder because of changes made to sections 188 and 189, effective January 1, 2019. He also requested the court appoint counsel during

---

[5] In petitioner's direct appeal, this court reduced the sentence on count 2 to a term of 25 years to life, struck a parole revocation fine imposed by the court, and directed the trial court to amend the abstract of judgment accordingly. In all other respects, we affirmed the judgment. (*Luna*, *supra*, F050272.) On July 3, 2007, the trial court amended the abstract of judgment to reflect this court's ruling.

9.

the resentencing process. He further stated he was convicted of first degree murder and could not now be convicted because he was not the actual killer; he did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of murder in the first degree; and he was not a major participant in the felony or did not act with reckless indifference to human life during the course of the crime or felony. Lastly, petitioner stated the murder victim was not a peace officer in the performance of his or her duties. On April 23, 2019, the trial court denied the petition without prejudice because it failed to allege and/or it could not be readily ascertained by the court whether petitioner served the petition on all parties required under section 1170.95, subdivision (b)(1).[6]

On May 10, 2019, petitioner filed a second petition for resentencing making the same declarations as his original petition. He further declared that he mailed the petition to the Office of the District Attorney and to his trial counsel. On June 13, 2019, the trial court denied petitioner's filing without prejudice because it failed to indicate the date on which all required parties were served with the petition.

On June 24, 2019, petitioner filed a third petition for resentencing making the same declarations as his original petition, and including proof of service that the petition was served on the offices of the District Attorney and Public Defender on June 20, 2019.

On July 3, 2019, the trial court found petitioner properly served all interested parties and concluded petitioner made a prima facie showing he fell within the provisions of section 1170.95. The trial court appointed counsel to represent petitioner and ordered the prosecution to file and serve a response. On July 25, 2019, the prosecution filed an

---

[6] Section 1170.95, subdivision (b)(1) requires that the petition be served on "the district attorney, or on the agency that prosecuted the petitioner, and on the attorney who represented the petitioner in the trial court or on the public defender of the county where the petitioner was convicted." Petitioner had declared in the petition that he had mailed the petition to the offices of both the District Attorney and the Public Defender.

opposition to petitioner's petition for resentencing pursuant to section 1170.95. The prosecution argued petitioner was not entitled to relief because (1) he participated in a conspiracy to commit murder and was not convicted solely under a theory of felony murder or murder under the natural and probable consequences doctrine, and (2) Senate Bill No. 1437 (2017-2018 Reg. Sess.) is unconstitutional. Petitioner did not file a reply.

On June 29, 2020, the trial court issued an order in which it found petitioner ineligible for relief under section 1170.95. The trial court summarized the facts as stated in our opinion in petitioner's direct appeal and concluded:

> "[I]t is clear that [p]etitioner was a participant in a conspiracy to commit murder. He suggested the victim as a target to Sure[ñ]o leader Valla[dares] and met with other Sure[ñ]os about this plan. While he was not the actual killer, he was clearly an aider and abettor to first-degree murder. With the intent that [Marcos] be shot, he aided and abetted Valla[dares] and other Sure[ñ]os in execution of the plan. (Penal Code § 189(e)(2).)"

The trial court denied the petition and a timely appeal followed.

## DISCUSSION

### I.      Applicable Law

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 (2017-2018 Reg. Sess.) "to amend the felony murder rule and the natural and probable consequences doctrine . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) The bill accomplished this task by adding three separate provisions to the Penal Code. (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).) First, to amend the natural and probable consequences doctrine, the bill added section 188, subdivision (a)(3), which requires a principal to act with malice aforethought before he or she may be convicted of murder. (§ 188, subd. (a)(3); accord, *Gentile*, at pp. 842-

11.

843.)  Second, to amend the felony-murder rule, the bill added section 189, subdivision (e):

> "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven:  [¶]  (1) The person was the actual killer.  [¶]  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.  [¶]  (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."[7]  (§ 189, subd. (e); accord, *Gentile*, at p. 842.)

Finally, the bill added section 1170.95 to provide a procedure for those convicted of a qualifying offense "to seek relief under the two ameliorative provisions above."  (*Gentile*, at p. 843.)  This procedure is available to persons convicted of "felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter." (§ 1170.95, subd. (a).)

"Section 1170.95 lays out a process" for a person convicted of one of the aforementioned offenses "to seek vacatur of his or her conviction and resentencing." (*Gentile*, *supra*, 10 Cal.5th at p. 853.)  First, an offender must file a petition in the sentencing court averring that:

> "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine[;]

---

[7] Additionally, section 189 was amended to allow for felony-murder liability where the victim is a peace officer.  (§ 189, subd. (f); accord, *People v. Daniel* (2020) 57 Cal.App.5th 666, 672.)

"(2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder[; and]

"(3) The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(1)-(3); see § 1170.95, subd. (b)(1)(A); accord, *People v. Lewis* (2021) 11 Cal.5th 952, 959-960 (*Lewis*).)

Additionally, the petition shall state "[w]hether the petitioner requests the appointment of counsel." (§ 1170.95, subd. (b)(1)(C).)

If a petition fails to contain the required information and the information cannot be "readily ascertained" by the court, the petition may be denied without prejudice to the filing of another petition. (§ 1170.95, subd. (b)(2).) Otherwise, counsel must be appointed, if requested. (§ 1170.95, subd. (b)(3).) The prosecutor must file a response and the petitioner may file a reply. The trial court must then hold a hearing to determine if the petitioner has made a prima facie showing that he or she is entitled to relief. (§ 1170.95, subd. (c); accord, *Lewis*, *supra*, 11 Cal.5th at pp. 961-963, 967.) In making this determination, the court may rely on the record of conviction. (*Lewis*, at pp. 970-971.) The record of conviction includes, but is not limited to, jury instructions and verdict forms. (See generally *id*. at p. 972.) However, the prima facie inquiry is limited and, at this stage of the proceedings, the court "should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.'" (*Id*. at pp. 971-972.)

If the court determines the petitioner has met his or her prima facie burden, "the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder[, attempted murder, or manslaughter] conviction and to resentence the petitioner on any remaining counts." (*Gentile*, *supra*, 10 Cal.5th at p. 853; accord, § 1170.95, subds. (c), (d)(1).) At the hearing, the prosecution must "prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3).) The prosecutor and the petitioner may offer new or additional evidence to

meet their respective burdens. The admission of evidence at the hearing is governed by the Evidence Code. However, the court also "may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed," as well as the "procedural history of the case recited in any prior appellate opinion." (§ 1170.95, subd. (d)(3).) Hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of section 872 is inadmissible at the evidentiary hearing, unless made admissible by another exception to the hearsay rule. (§ 1170.95, subd. (d)(3).)

## II.    Analysis

Petitioner contends the trial court improperly applied a substantial evidence test and engaged in improper factfinding at the prima facie stage. Petitioner further contends the record of conviction suggests he may have been found guilty of first degree murder and conspiracy to commit murder based on imputed malice and imputed premeditation, and the gang special circumstance may have been found true without a finding of an intent to kill. Finally, petitioner contends the trial court violated his procedural due process rights by denying his petition at the prima facie stage without issuing an order to show cause. We agree the trial court appears to have engaged in improper factfinding at the prima facie stage, but conclude the error was harmless because the record establishes petitioner, as a matter of law, is ineligible for resentencing pursuant to section 1170.95.

### A.    Standard of Review.

"Because we are tasked with applying the section 1170.95, subdivision (c) standard governing prima facie entitlement to relief [citation], our review is de novo. [Citation.] As with any case involving statutory interpretation, our primary goal is to ascertain and effectuate the lawmakers' intent. [Citation.] [¶] In applying the de novo standard, we accept the pleaded facts as true [citation], but evaluate those facts in light of facts readily ascertainable from the record of conviction . . . . A petition's allegations fail to show entitlement to relief at the section 1170.95, subdivision (c) stage if 'readily

14.

ascertainable facts' in the record of conviction 'conclusively refute them as a matter of law.' " (*People v. Secrease* (2021) 63 Cal.App.5th 231, 244, review granted June 30, 2021, S268862.)

> **B.** **It was Error for the Trial Court to Engage in Factfinding at the Prima Facie Stage Under Section 1170.95.**

Petitioner contends the trial court improperly applied a substantial evidence test and engaged in improper factfinding. We agree the trial court appears to have engaged in improper factfinding at the prima facie stage.

As previously noted, at the prima facie inquiry the trial court "should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Lewis*, *supra*, 11 Cal.5th at p. 972; see *People v. DeHuff* (2021) 63 Cal.App.5th 428, 439 [" '[T]his authority to make determinations without conducting an evidentiary hearing pursuant to section 1170.95, subd[ivision] (d) is limited to readily ascertainable facts from the record [of conviction] (such as the crime of conviction), rather than factfinding involving the weighing of evidence or the exercise of discretion . . . ."], abrogated on another ground in *Lewis*, at p. 962.) "If, accepting the petitioner's asserted facts as true, he or she meets the requirements for relief listed in section 1170.95, subdivision (a), then the trial court must issue an order to show cause" unless facts in the record conclusively refute the petitioner's assertions. (*People v. Drayton* (2020) 47 Cal.App.5th 965, 968, abrogated on other grounds by *Lewis*, at p. 962.)

Here, the trial court appears to have engaged in improper factfinding at the prima facie stage in finding petitioner ineligible for resentencing relief under section 1170.95. As previously noted, in its order, the trial court summarized the facts from our prior opinion stating:

> "[I]t is clear that [p]etitioner was a participant in a conspiracy to commit murder. He suggested the victim as a target to Sure[ñ]o leader Valla[dares] and met with other Sure[ñ]os about this plan. While he was not the actual killer, he was clearly an aider and abettor to first-degree murder. With the

15.

intent that [Marcos] be shot, he aided and abetted Valla[dares] and other Sure[ñ]os in execution of the plan.  (Penal Code § 189(e)(2).)"

As we explain in greater detail below, the record of conviction, and specifically the jury's verdict, readily establishes that petitioner was a participant in a conspiracy to commit murder and an aider and abettor who acted with intent to kill.  However, to the extent the trial court independently weighed the evidence to reach these conclusions, the trial court erred.  (See *People v. Gonzalez* (2021) 65 Cal.App.5th 420, 432, review granted Aug. 18, 2021, S269792 [holding the trial court improperly engaged in factfinding at the prima facie stage in finding the defendant acted with implied malice and was a major participant who acted with reckless indifference to human life].)

###### C.    Petitioner was not Prejudiced by the Trial Court's Error.

Because it appears the trial court engaged in improper factfinding, we may affirm the trial court's order only if petitioner was not prejudiced by this error.  To demonstrate prejudice, petitioner must show that, absent this error, it is reasonably probable his petition would not have been denied without an evidentiary hearing.  (*Lewis*, *supra*, 11 Cal.5th at pp. 972-974; see *People v. Watson* (1956) 46 Cal.2d 818, 836.)  As we explain, we conclude petitioner cannot demonstrate prejudice because he is ineligible for resentencing as a matter of law.

To be eligible for relief pursuant to section 1170.95, petitioner must not have been the actual killer, must not have acted with the intent to kill or malice aforethought, and must not have been a major participant in the underlying felony who acted with reckless indifference to human life.  (§§ 188, subd. (a)(3), 189, subd. (e), 1170.95, subd. (a)(3); see *Gentile*, *supra*, 10 Cal.5th at p. 842.)  Here, the jury found true a gang special circumstance pursuant to section 190.2, subdivision (a)(22), which imposes a sentence of death or life without the possibility of parole for a murder involving the defendant's active participation in a criminal street gang.  To find the special circumstance true, the

jury was required to find petitioner intended to kill the victim. (§ 190.2, subds. (a)(22), (c).) Section 190.2, subdivision (a)(22) applies where:

> "[t]he defendant *intentionally killed the victim* while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." (Italics added.)

Where the defendant is not the actual killer, this special circumstance applies only if the defendant, "with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree." (§ 190.2, subd. (c); accord, *People v. Fayed* (2020) 9 Cal.5th 147, 201-202.) When read together, these provisions make clear that only " 'one who intentionally aids or encourages a person in the deliberate killing of another,' " in the manner or for the reasons described by the statute, is subject to the special circumstances punishment. (*Fayed*, at p. 202; accord, *People v. Allison* (2020) 55 Cal.App.5th 449, 460.)

The instruction on the gang special circumstance likewise required the jury to find "[t]he defendant intended to kill." Thus, the relevant jury instruction confirms the jury was properly instructed on the elements of the special circumstance, including the requirement that petitioner intended to kill the victim. We therefore reject petitioner's argument the special circumstances did not require the jury to find he intended to kill the victim. To the contrary, the special circumstance finding establishes the jury made the findings necessary to sustain a murder conviction under section 189, as amended by Senate Bill No. 1437 (2017-2018 Reg. Sess.). Petitioner is therefore ineligible for resentencing as a matter of law and he was not prejudiced by the trial court's improper factfinding at the prima facie stage.

Nonetheless, petitioner argues the special circumstance instruction was insufficient because the court "failed to instruct on the specific intent to kill requirement for aiders and abettors." More specifically, petitioner contends the court was required to give CALCRIM No. 701, which applies to murders committed before June 6, 1990, to

fully inform the jury of the intent to kill requirement. The Bench Notes for CALCRIM No. 701 specify that the instruction is not applicable in cases such as the one before us, where "the instruction on the special circumstance states 'the defendant intended to kill' as an element." Furthermore, we do not see how the court could have more clearly instructed the jury on the intent-to-kill requirement other than by stating, as it did, that the jury was required to find "[t]he defendant intended to kill."

Petitioner also contends the jury instructions establish he may have been found guilty of first degree murder and conspiracy based on imputed malice and imputed premeditation and without an intent to kill. Even if the instructions permitted a conviction for felony murder, murder under a natural and probable consequences theory, or some other theory of imputed malice and premeditation, the special circumstance finding makes clear that the jury did not, in fact, find petitioner guilty under such theories, but rather based on his own mental state of intent to kill. Accordingly, petitioner's conviction is unaffected by changes to sections 188 and 189 made by Senate Bill No. 1437 (2017-2018 Reg. Sess.), and he is ineligible for resentencing as a matter of law. (§ 1170.95, subd. (a)(3).)

Finally, we reject petitioner's assertion the denial of his petition without issuance of an order to show cause violated his constitutional rights to due process. Due process is implicated when the state attempts to deprive a defendant of some liberty interest. (*Hewitt v. Helms* (1983) 459 U.S. 460, 466, abrogated on another point by *Sandin v. Conner* (1995) 515 U.S. 472, 483, fn. 5.) But petitioner is "categorically ineligible for relief under section 1170.95." (*People v. Tarkington* (2020) 49 Cal.App.5th 892, 908, review granted Aug. 12, 2020, S263219, abrogated on another ground by *Lewis*, *supra*, 11 Cal.5th at pp. 962-963.) Therefore, petitioner has no liberty interest in any of the procedures afforded by section 1170.95, subdivision (d). (See *Tarkington*, at p. 908.)

**DISPOSITION**

The order denying petitioner's section 1170.95 petition is affirmed.